[Civ. No. 336.     Third Appellate District.—August 28, 1907.]

EDWARD J. MATTESON, WALTER C. MATTESON, Mrs. J. A. HATHAWAY and H. R. HATHAWAY, Appellants, v. SOUTHERN PACIFIC COMPANY, Respondent.

NEGLIGENCE—ACTION FOR DEATH—CONTRIBUTORY NEGLIGENCE—SUPPORT OF VERDICT.—In an action for death alleged to have been caused from injuries sustained through the negligence of the defendant railroad company, where there is evidence from which the jury might have inferred that the contributory negligence of the deceased was the proximate cause of the injury, and the contrary cannot be said as matter of law, the verdict of the jury for the defendant, notwithstanding evidence of its negligence, is sufficiently supported, and cannot be disturbed upon appeal.

ID.—LAST CLEAR OPPORTUNITY TO AVOID INJURY.—The one who has the last clear opportunity to avoid the injury is responsible therefor, whether it be the defendant or the deceased, and where the defendant could not have anticipated that the deceased would attempt to move around a backing train, the motion of which she could clearly see, the principle applied to the deceased.

ID.—PROPER INSTRUCTIONS—LAW APPLICABLE TO FACTS.—Held, that the court properly instructed the jury as to the law applicable to the facts proved tending to show the negligence of the defendant and the contributory negligence of the deceased, and as to the last clear opportunity of the deceased to avoid the injury.

ID.—EVIDENCE—HEARING OF ALARM BELL—IMMATERIAL RULING.—The exclusion of evidence as to whether an alarm bell could be heard at the residence of the deceased was not material, where it was admitted that no alarm bell was rung, and it clearly appeared that deceased was familiar with the crossing.

ID.—ISSUE AS TO LIGHTS ON REAR CAR—EXCLUSION OF EVIDENCE.—
Where the only issue was as to lights on the rear car, the exclusion
of evidence as to lights on any of the cars was not erroneous, where
the witness was permitted to testify as to lights on the rear car.

ID.—TESTIMONY OF REAR BRAKEMAN.—Where the rear brakeman had
fully explained "that he could have stopped the train anywhere,"
it was not error to exclude evidence on cross-examination as to
whether he could not have stopped it before reaching the street
crossing.

ID.—EXCLUSION OF EVIDENCE—ERROR NOT PREJUDICIAL.—Error in ex-
cluding evidence as to whether a witness for plaintiff saw any per-
son on the end of the train with a lantern was not prejudicial where
the witness had testified that he could not observe anyone on the
train, unless he was close up, and that he did not know that the
caboose car was on the train, and saw no light anywhere.

ID.—REFUSAL OF REQUESTED INSTRUCTIONS—MODIFICATION.—The court
harmlessly refused instructions requested by plaintiffs on the ques-
tion of damages, which was eliminated by the verdict, and prop-
erly refused instructions invading the province of the jury, or ig-
noring facts proved, or assuming facts not proved, or coupling cor-
rect propositions with such as were incorrect, and properly modi-
fied requests to make them conform to the law, as properly declared
in the instructions given by the court.

ID.—PLEADING—DEMURRERS—LEAVE TO AMEND IN PART—NOTICE—DE-
MAND FOR DEFAULT—DISCRETION—ERROR NOT SHOWN—PRESUMP-
TIONS.—Where a general and special demurrer to the complaint was
sustained in part and overruled in part with ten days' leave to
amend the complaint, and one week thereafter plaintiffs notified
defendant of the ruling, and of their declining to amend, and one
week later demanded defendant's default, the court had discre-
tion to refuse it, and to grant to the defendant further time to an-
swer, and where the record upon appeal shows no abuse of dis-
cretion or error in the ruling of the court, all presumptions are in
favor of the action, and it will not be disturbed upon appeal.

APPEAL from a judgment of the Superior Court of San
Joaquin County.  Frank H. Smith, Judge.

The facts are stated in the opinion of the court.

A. H. Carpenter for Appellants.

Buck & Middlecoff, for Respondent.

CHIPMAN, P. J.—Action for personal injury by defend-
ant to Catherine Matteson, mother of plaintiffs.  The cause

was tried to a jury and defendant had the verdict. Plain-
tiffs appeal from the judgment. The accident happened on
Sacramento street, at the crossing of Channel street, in the
city of Stockton, on January 21, 1904. A train of thirteen
or fourteen freight cars and caboose came into Stockton on
the Oakdale branch of the Southern Pacific Railroad from
the east along Weber avenue, which runs east and west; ap-
proaching Sacramento street the train moved on a Y diag-
onally through a block northward to get to the main line on
Sacramento street at a point a short distance north of the
Channel street crossing; reaching the main line with all its
cars the train backed south toward the depot, situated on the
southwest corner of Sacramento street and Weber avenue; at
the rear end of the train was the caboose used for passengers;
as the caboose approached the north foot-crossing leading
across Sacramento street from the pavement along the north
side of Channel street, Mrs. Matteson, going east, started to
cross Sacramento street, and when about in the middle of the
street was struck by the lower step on the east side of the
caboose and in falling was caught by the car wheel, receiving
the injuries complained of; she died on February 24, 1904.

1. It is urged that "there is absolutely no evidence to sup-
port the verdict in any particular." This court will not
disturb the implied findings of fact by the jury where there
is substantial conflict in the evidence upon which such findings
are based. In its review of the record the court is not called
upon to set forth even briefly all the evidence submitted in
support of the issues; it is required only to determine that
there was sufficient evidence given to the jury to justify their
verdict. The court cannot pass upon the credibility of wit-
nesses or say that the jury erred in giving credit to one or
more witnesses called by one party and in refusing credit to
one or more witnesses called by the opposing party, or erred
in believing part of the testimony of a witness and in dis-
believing a part, or erred in arriving at a verdict by accepting
a part only of the testimony submitted by both parties. The
privilege as well as the duty of the jury is to reach a verdict
from a consideration of all the evidence and the surrounding
circumstances disclosed and, having thus reached a verdict on
sufficient evidence, this court is powerless to disturb it. We
are moved to make these observations because of our being
constantly confronted by arguments against the sufficiency of

the evidence to support judgments and verdicts on the erroneous assumption that this court will reach a conclusion of its own from the evidence found in the record.

In this class of cases the stress of the argument is usually found to be directed to the question as to whose negligence was the proximate cause of the injury, and the present case is no exception to the rule. There was evidence that deceased was about seventy-four years old, but was in possession of all her faculties. She testified that at the time of the accident her hearing and eyesight were good, and her family physician testified: "For a lady of her age she was a remarkably healthy woman, remarkably so, a woman with a great deal of vitality." The train arrived at the point of the injury shortly after 6 o'clock P. M. Some of the witnesses speak of its being "dark" and others as "dusk." Deceased testified: "It was dark but light enough so that I could see the train." Other witnesses testified that it was light enough to observe at the crossing of Channel street whether the train was moving toward or away from that street after it had got to the main line. There was a brakeman on the second freight car from the front end of the train and another brakeman at the rear end of the caboose. The front brakeman ran to the main line to see if it was clear and signaled from there; the train moved along the Y to the main track, the front brakeman taking his place on the ladder of his car as it passed; from this position he was signaled by the rear brakeman when the caboose had passed the switch and he in turn signaled the fireman in the engine, who gave the word to the engineer. The rear brakeman threw the switch and signaled all clear to back; the engineer gave three long blasts of the whistle and commenced to back, and as the caboose passed him the rear brakeman jumped onto the rear lower step on the west side of the caboose, from which point he could signal with his lantern to the engineer; when the train started to back the caboose was about two hundred feet north of Channel street; there was nothing to obstruct a view of the track or the train; it started slowly and did not attain a speed greater than four to six miles an hour. There was evidence that the caboose lamps inside were lighted before reaching Stockton and two lamps on the outside at the rear of the car, and the rear brakeman was on the lower rear step of the caboose with a lighted lantern; there was evidence that the bell was started to ring

automatically when the train began to back and that it was heard by the rear brakeman. He was asked what happened when the caboose passed the switch backing down toward Channel street. He testified: "I got on the rear platform of the caboose, the step on the west side, and I stood on the rear steps of the caboose. As I stood on the steps passing over the switch I came along down here, and as I come near Channel street—it was dusk, I couldn't tell whether it was a lady or man—I noticed a form start from the sidewalk or from that direction, toward the sidewalk on the west side of the track; right from this sidewalk here. As they came toward the track I called out 'look out there,' and at that they came up near the track, I can't say exactly how far, and hesitated, then started to go in a direction around behind the caboose. As they did I thought to myself they will never make it, so I jumps on the platform of the caboose—we have an air valve there, we call it the 'gun' in speaking on the railroad—and I pulled that wide open, threw all the air we had on the brakes of the train to stop. As I did, this party was just struck by the steps on the east side and thrown over on the ground. I immediately jumped down and see how it was. I was pretty well excited because I felt pretty bad to think it was an old lady of that kind. If it was my mother I couldn't have done any more to prevent hurting her. I raised her up and kind of drew her back from the track. At that time I only could see the one foot, and that was the left foot, was crushed, and the shoe was torn. I didn't examine it to see how bad it was hurt, and I raised her up on my knee and my arm partly, and it was very near time for the passenger to come from Sacramento and we was on the main line, and as I was there, there was another employee of the company, an engineer by the name of Chase that I knew personally and once worked with, an employee of the company, and I says to him, 'Dick, hold this lady here, look out for her until the ambulance comes, I have sent for the ambulance, I will have to get this train off of the main line.' He took charge of her, and then I resumed my position on the back end of the train and gave the signal to back. As soon as I took the lady up on my knee and on my arm, there was a young boy, I don't know who he was, I said run to the depot immediately and have them telephone for the ambulance because this lady is hurt, and we want to get her up from here as quick as possi-

ble, and the boy went as quick I guess as he could and I resumed my position and backed the train into the vard, and after I got down into the yard, I came back and by that time the ambulance had taken the lady and gone. . . . After I applied the air the train stopped in about half the length of the car—of the caboose.''

On cross-examination he testified: ''When I first saw her she was on the north side of Channel street and the west side of Sacramento street, going east. With reference to the railroad track when I first saw her she was nearer the sidewalk than the track, I can't say exactly how many feet or how far, just come from the sidewalk. It must have been twenty feet I guess, in my judgment, I won't state any definite distance. The train was backing at the time.

''Q. When did you next see her? A. Why, I saw her when she hesitated before she went across. When I saw her hesitate I should judge she was about six feet from the track, and the train was still backing.

''Q. Describe her actions as you saw her at this time. A. Well, she hesitated, and then started to take a circular position around the hind end of the train.

''Q. Did you see any movement of her body? A. Any movement? Nothing more than seeing the form as it went. I observed that she had an idea that she was going across, and I put the air on immediately. . . .

''Q. When you first saw Mrs. Matteson approaching the track, did she hesitate at any time prior to the time that she got near or close to the track? A. She hesitated as I called to her.

''Q. After you called to her, what happened? A. Well, she hesitated.

''Q. And what happened? A. Then she started to go around the train.

''Q. And what happened? A. Well, I threw the air on, and the step of the east side of the car hit her and threw her down.

''Q. You could have stopped the train sooner, could you not? A. Not after she started to go across. I stopped it as quick as I could.

''Q. You may state whether or not you had an opportunity to stop the train before it reached the crossing after you first

saw her approaching the track?   A. I could have stopped the train anywhere as far as that is concerned. . . .

"The Court: At the time you called to Mrs. Matteson about how far, if you can tell, was she from the rear end of the caboose?   A. Well, she must have been—I can't just exactly answer that definitely, but she was about a car length, and about six or eight feet, whatever I gave it there, from the track.

"Q. What I want is how far she was from the end of the caboose?   A. I should judge about twenty to thirty feet from the caboose, about the length of it, might have been a little more."

On recross he testified: "Q. How far was the train away, the end of the train away from Mrs. Matteson when she attempted to walk around it, as you say that she did do?

"Mr. Buck: We object to that; he said she started to run around it.

"Mr. Carpenter: I don't care whether you call it running or walking.   A. Well, that is the same answer, twelve or fifteen feet.

"Mr. Buck: That means around the end of it?   A. Yes, sir.

"The Court: In what direction was she approaching the track, was she still on the crossing that was perpendicular to the track or not?   A. She left the cross-walk immediately as she started to run behind the train."

It appeared that the conductor of the train registered its arrival at 6:05 P. M., and that the register at the receiving hospital showed that Mrs. Matteson arrived there at 6:20 P. M.; there was evidence that the ambulance came for her within a few minutes after she was injured; that meanwhile she was cared for by direction of the train men as well as it was possible under the circumstances and that the trainmen moved the train without waiting for the ambulance in order to clear the track for a passenger train due about that time.   Some of the most important facts narrated by this brakeman were corroborated by witnesses.   It is true that there was testimony given by witnesses that they heard no whistle or bell; that the caboose was not lighted; that a warning bell placed at this crossing by the defendant company did not ring, and this latter fact was undisputed, and Mrs. Matteson in a deposition taken, at which defendant was not represented, testified:

That she thought the track was clear; that she saw no lights on the end of the train; that there was no one near the end of the train; that she heard no one call or shout to her and that she heard no bell. But she was not asked and did not testify whether she stopped or looked or listened.

Without pursuing the evidence further, it is manifest that the jury accepted the testimony given by the trainmen and other witnesses whose testimony tended to corroborate them. It seems to us that it cannot be said as matter of law that the jury were not warranted in reaching the verdict rendered by them. Much of the argument of plaintiffs' counsel is based upon testimony as to facts which the jury probably did not accept as true. If it be conceded that defendant was guilty of negligence in backing its train in the night-time through the streets of a city without placing guards or warning signals at cross-streets; conceding that when the rear brakeman first saw Mrs. Matteson start to cross the street from the pavement he could have put the air-brake on and stopped the train for her to pass, still the question remained for the jury to determine whether under the circumstances it was the brakeman's duty to do this at that moment, or whether she was not guilty of contributory negligence in attempting to pass around the train when she must have known that it was there and was moving toward her but a few feet distant, and whether her negligence was not wholly the direct and proximate cause of her injury. The jury must have reached this latter conclusion, and we cannot say as matter of law that they were not justified in doing so. The plaintiffs contend that when she started to cross the street she thought the train was moving north instead of south and was thus deceived through the failure of defendant to ring its warning bell at the crossing and its failure to have lights in the caboose or at the rear of the car; furthermore, it is contended that by the brakeman's own testimony it appeared that he could have stopped the train, had he tried to do so, when he saw Mrs. Matteson step into the street to cross it. But there is no evidence that she thought the train was moving away from her; there was evidence that she could see the train; that lights were in the caboose and on its rear end outside; that the brakeman shouted to her and she hesitated and then left the cross-walk and attempted to go around the moving train, showing that she must have known the direction the train was moving but

thought she could thus avoid the danger. The instant she disclosed this purpose the brakeman acted as quickly as was possible. We cannot say as matter of law that the circumstances were such as to have required the brakeman to anticipate Mrs. Matteson's purpose and to have applied the brake sooner than he did in order to free his company from responsibility for the accident.

The principle that he who has a clear opportunity of avoiding an accident by the exercise of proper care to avoid injuring another (or, we may add, avoid being injured), must do so, is wise and humane, but we do not think the facts here make the rule applicable to defendant. It cannot be reasonably claimed that when the brakeman saw Mrs. Matteson move toward the train from the pavement he believed or had reason to believe that she intended to continue her course to the extent of attempting to pass around the moving train. The more natural and reasonable assumption would be to a person in his position that she would stop until the train had passed. Failing to do so, the principle above stated finds peculiar application to her; she had the last clear opportunity to avoid the accident by the exercise of proper care and should have done so. In the case of *Sego* v. *Southern Pacific Co.*, 137 Cal. 405, [70 Pac. 279], it was said: "In discussing this rule of law it is said in *Everett* v. *Los Angeles Ry. Co.*, 115 Cal. 128, [43 Pac. 210] : 'This rule can never apply to a case where, as here, the negligence of the injured party continued up to the very moment of the injury, and was a contributing and efficient cause thereof. For it is apparent by the slightest care and effort on the part of the deceased he could have put himself out of danger up to the last moment before he was struck.' And that is exactly the case the court now has before it. The negligence of the party killed continued up to the very moment of time when he was struck by the approaching train. There is here no question of remote or earlier negligence upon his part. And conceding him guilty of negligence, that negligence necessarily contributed directly to his death. The case at bar is quite similar in its facts to *Glascock* v. *Central Pacific R. R. Co.*, 73 Cal. 140, [14 Pac. 518], where this court said: 'Mr. Glascock either saw the train before he reached the track or he did not look toward the track as he approached it. . . . If he looked he saw; and, having age and faculties to understand the dangers, is charged with a knowledge of

them, and was bound to act upon that knowledge as a prudent and cautious man would under the circumstances. His failure so to act was negligence which, notwithstanding the negligence of the defendant, the law regards as such a contributory cause on his part as will make the injury his own misfortune and relieve the other party from liability therefor.' "

The court gave the following instructions (marked XL and XLII), which we think correctly stated the law applicable to the facts of the case:

"XL. The jury are instructed that the sole purpose of signals, at crossings or on trains, such as the ringing of bells or the sounding of whistles or the presence of lights or of the presence of gates or of flagmen or of the stationing of employees at any particular portion of the track or train, so far as the same relates to persons approaching a railroad crossing for the purpose of crossing the same, is to warn such person of the presence of a railroad track and of an approaching train. And the jury are instructed in this connection that if they believe from the evidence that even if defendant was negligent in failing to provide any or all of the foregoing modes of warning at any of the times mentioned in the complaint herein to Catherine Matteson while she was approaching defendant's track on Sacramento street for the purpose of crossing the same; still if you further believe from the evidence that at any time while Catherine Matteson was on Channel street approaching said track, and while she was still in a position of safety she could by listening have heard defendant's approaching train, or by looking have seen it, and without so doing attempted to cross defendant's track and was injured, then your verdict must be for the defendant."

"XLII. The jury are instructed that there is no conflict in the evidence that at all the times Mrs. Matteson was approaching along the pathway to the crossing of the track she was in a position of absolute safety up to the time she stepped in front of the train and there is no rule of law which would charge any of defendant's employees with knowledge that while she was in such position of safety she would change her position of safety for one of peril. On the contrary, the employees of defendant had a right to assume that Mrs. Matteson was in possession of her faculties and would retain her place of safety and not recklessly expose herself to dan-

ger. And even if you believe that Mrs. Matteson gave no indication of knowledge of the approaching train, still the defendant's employees were not bound to assume that she would heedlessly leave a place of safety and put herself upon the track and in danger of her life.

"And you are instructed, if you believe from the evidence that any of defendant's employees saw Mrs. Matteson approaching the train on Sacramento street, that such employee had the right to presume that Mrs. Matteson was in possession of her ordinary faculties and alert to the danger which might ensue from passing trains, and that she would not attempt to cross in view of the train, and that, therefore, that such employee was not required to check the speed of the train in order to enable Mrs. Matteson to cross in front of it or to ascertain whether or not she was about to do so."

2. Numerous errors of law are assigned as occurring at the trial. In plaintiffs' brief some of these are grouped under ten different paragraphs. These relate to the question of damages, which become immaterial in view of the verdict of the jury that defendant was not liable for the injury complained of; some others will be noticed.

A witness for the plaintiffs was asked whether the alarm bell at the Channel street crossing could be heard at Mrs. Matteson's residence. The court sustained an objection to the question as irrelevant and immaterial. We cannot see that it was material, inasmuch as it was an admitted fact that the bell did not ring and that it clearly appeared that Mrs. Matteson was familiar with the crossing.

The witness Haley for plaintiffs was asked if he saw any lights on any of the cars. The question was refused on the ground that there was no issue raised by the pleadings except as to the lights on the rear car. The witness was permitted to testify as to lights on this car. The ruling was not error.

The rear brakeman, Slocum, was asked on cross-examination by plaintiffs the following question: "And you could have stopped it (the train) very handily couldn't you before it reached Channel street crossing?" Plaintiffs were not injured by the ruling excluding the question. The witness had fully explained "that he could have stopped the train anywhere." The question had no necessary bearing upon the stopping of the train at the crossing.

A witness for the plaintiffs was asked to state whether or not he saw any person on the end of the train with a lantern, and the court refused the question, to which plaintiffs excepted. The question was pertinent and should have been allowed. We do not think, however, that plaintiffs were prejudiced by the ruling, for the witness had just answered the question whether he noticed any brakeman on the rear platform of the caboose: "It was so dark without a person was right close up, and I was pretty close, that you could not observe anyone on the train." He had also testified that he did not know at the time that a caboose car was on the train and that he saw no light at any place on the train. Plaintiffs had the benefit substantially of all that this witness knew.

3. Plaintiffs asked for thirty-two separate instructions, some of which were given as asked; others were given with some modifications and still others were refused. Ten instructions were given at defendant's request and twelve on the court's motion. Plaintiffs excepted to the instructions asked by them and given with modifications by the court, and excepted to the ruling of the court in refusing to give other of their instructions. Some of defendant's instructions are not objected to in plaintiffs' brief and others are challenged. It would needlessly prolong this opinion to state the grounds on which these numerous rulings of the court may be sustained. Quite a number of the instructions objected to relate to matters of damage which are eliminated by the verdict; others of plaintiffs' instructions if given would have been an invasion of the exclusive province of the jury; in the instances where the court modified plaintiffs' proposed instructions the ruling of the court, it seems to us, was necessary to make the instruction conform to law; others entirely ignored the evidence of contributory negligence on the part of Mrs. Matteson; others assumed facts as proven about which the evidence was conflicting; others were framed on the assumption of facts as proven as to which there was no evidence, and still others contained several distinct propositions, some of which, if separately stated, were proper to be given, but which were associated with propositions not proper to be given. We have given all the instructions careful consideration and are satisfied that no prejudicial error was committed by the court. The jury were fully and correctly instructed

on all pertinent points relating to liability arising from negligence as applicable to both parties.

4. Defendant filed a general demurrer and also a special demurrer to the second amended complaint. The demurrer was, on November 28, 1904, sustained as to certain paragraphs and overruled as to the balance of the complaint, and plaintiffs were given ten days in which to amend. Notice of the order was served on defendant on December 5, 1904, also notifying defendant "that the plaintiffs decline to amend their complaint," and on December 12, 1904, plaintiffs moved the court for a default against defendant for not serving or filing its answer to the complaint, and also on the same day made a written demand upon the clerk to enter a default against defendant. On December 19, 1904, the court ordered: "that the motion of plaintiffs for a default against defendant be denied—to which ruling of the court the plaintiffs then and there excepted"; and the court also ordered that defendant have ten days from and after said December 19, 1904, to answer plaintiffs' second amended complaint if defendant should be so advised. It appears from the record that plaintiffs' motion for a default to be entered against defendant was made on the seventh day after notice to defendant above referred to and not after ten days, as claimed by plaintiffs in their brief. But, aside from this fact, the bill of exceptions fails to show upon what grounds or upon what showing the court refused to order the default of defendant to be entered or that the record contains all the proceedings upon the motion. Error must be made affirmatively to appear and all presumptions must be indulged in support of the order. The matter was within the discretion of the court, abuse of which is not shown.

Upon full consideration of all questions before us upon the appeal we discover no prejudicial error, and the judgment is, therefore, affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 25, 1907.